1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ANDRE RAMON CRAVER,                    No. CIV S-06-1543-FCD-CMK-P

12                    Petitioner,

13          vs.                             <u>FINDINGS AND RECOMMENDATIONS</u>

14   FELKER, et al.,

15                    Respondents.

16   _____/

17          Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court are petitioner's petition

19   for a writ of habeas corpus (Doc. 1), respondent's answer (Doc. 14), and petitioner's reply (Doc.

20   20).  Also before the court is petitioner's motion for a stay and abeyance order (Doc. 28) to allow

21   him to exhaust unexhausted claims.

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

# I. BACKGROUND

**A.**   **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> The information was filed in December 2001. As ultimately amended, it charged defendant and co-defendants Eric Linell Shelmire and Gerald Jones, Jr., with first degree murder of Justin Roberts on September 14, 2001, with a firearm, during a burglary (§§ 187, 190.2, subd. (a)(17), 12022, subd. (a)(1)). The information also alleged attempted robbery as a special circumstance, but the prosecutor expressed an intent to dismiss it after the jury deadlocked on it.
>
> On March 1, 2002, the trial court relieved the Public Defender's office due to a conflict and appointed Julian Macias to represent defendant. The court subsequently appointed additional counsel, Lisa Franco, who handled the DNA issues in the case.
>
> In July 2003, the trial began, with a separate jury for each defendant. Evidence adduced for defendant's jury included the following:
>
> On September 14, 2001, around 4:00 a.m., victim Justin Roberts was fatally shot in his apartment. Roberts grew marijuana on his patio for medicinal purposes but also sold it to his friends. Officers found marijuana valued at over $7,000.
>
> Roberts's girlfriend, Sally Lewis, testified she and Roberts and their two children occupied the master bedroom, while Sally's brother (Levi Lewis) slept in the second bedroom, and friend Eric Aguiar slept on the living room couch. On the night in question, Sally awoke and heard signs of a struggle. She followed Roberts down the hall and was blinded when he turned on the hall light. Sally heard three gunshots fired in quick succession and then heard the window blinds fluttering. She gathered her children and returned to the living room, where Aguiar was bleeding from the head.  Levi joined them. They found Roberts on the bathroom floor, bleeding to death. Aguiar performed CPR but was unable to save him. It was stipulated Roberts died of a gunshot wound to the chest.
>
> Aguiar testified he had been asleep on the couch situated perpendicular to the living room window, with the window open a crack, when he heard the window blinds crashing and felt an intruder land on top of him and strike him in the head with something metallic.  The assailant yelled "motherfucker." Aguiar, who had martial arts training, testified, "I grabbed him by the neck and pulled him close and felt his nose and followed it to his eye and shoved it through his eye to get him off me." Aguiar was aware from his training that sticking a finger into the eyeball

---

[1]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

of a person could be disabling, and that is why he did it.  Aguiar felt the eye blinking and the eyeball moving. The intruder screamed, "I need help. I need help." Within seconds, the hallway lights came on and three gunshots were fired.  Aguiar thought it unlikely that his assailant fired the shots. As soon as the shots were fired, Aguiar's assailant left through the window. Aguiar could not identify his assailant and could only describe him as a Black man whose skin was darker than co-defendant Shelmire's and whose hair was in braids or dreadlocks.

About two weeks before the killing, Aguiar agreed to sell a pound of marijuana to a stranger nicknamed Munchie (defendant), who was a friend of Roberts's friend Gilbert Espinoza. Aguiar (who was previously convicted of felony transportation of marijuana) met Munchie at night in a restaurant parking lot. Aguiar described Munchie as a Black man with dreadlocks (similar to defendant's hair in court), who arrived in a blue Chevy.  Munchie sat in the passenger seat of Aguiar's car. They spoke briefly, and Munchie handed Aguiar the money and received the marijuana. There was no overhead light in Aguiar's car and he did not discover until later that the money was fake. Aguiar paid Roberts to cover the loss. At trial, Aguiar identified defendant as Munchie but could not be 100 percent sure, because two years had passed since the incident.

Aguiar did not immediately suspect defendant as the assailant, because Aguiar did not think defendant knew where he lived. Aguiar could not identify defendant as the assailant.

Steven Palenko, who lived near Roberts's apartment, was awakened on the night of the killing and heard three gunshots. He tried to call 911 but misdialed in the dark. He heard a woman scream, "my husband's been shot." From his window, Palenko saw three "darker-skinned," medium-build males running from the direction of the victim's apartment. The men jumped over a fence (there were two fences, side by side, one wooden and the other chain link, each about six feet high). The men then ran to the gate in the next apartment complex, where they crouched behind bushes and waited for a car to pass before opening the gate. Two men went to the left, while the third went to the right. Palenko then succeeded in calling 911. A responding deputy sheriff detained co-defendant Shelmire as he ran through a gas station. In a field identification, Palenko identified Shelmire as one of the three men.

A few days later, officers showed Palenko five loose DMV photographs, and he picked out defendant's photograph as looking familiar as being one of the fleeing men.  Palenko did not identify defendant in court and was not asked to do so. Defense counsel Macias did not cross-examine Palenko at trial.

Defendant was arrested on October 3, 2001, at a mobile home where he was staying.  A blue Chevy Caprice was parked outside. The arresting officer did not notice any eye injury on defendant. An officer searched the bedroom where defendant slept, which contained personal belongings of defendant and of the owner's daughter, Tina Massengill, who kept her belongings in the bedroom but slept in the living room. The search disclosed a yellow plastic garbage bag containing among other items Rapid Transit passes bearing defendant's name and a torn real estate ad on the back of which were handwritten notations ("CODE," "# 2222," and "# 9513") with the codes to enter and exit the locked gate at the

1    apartment complex where Roberts lived.

2  The state court then added in footnote four:

3        The people say the inference is that the gate code was obtained
     from Gilbert Espinoza, who knew defendant, Roberts and Aguiar.  At trial,
4      Espinoza admitted getting the code from Roberts but denied giving it to
     defendant.

5

6  The state court continued as follows:

7        Tina Massengill testified she talked to defendant on his cell phone
     a day or two before the killing, and he said he was in San Jose. He said he
8      did not have the rent money but was "working on it." Tina next saw
     defendant early on the day of the killing. She woke up when he came
9      home. She estimated the time was between 2:00 and 4:00 a.m., but she did
     not look at the clock. She did not notice any eye or nose injury on
10     defendant.  She saw him in the daylight a couple of days later and did not
     notice any eye or nose injury.
11         Co-defendant Shelmire's girlfriend, Kim Domondon, testified -- in
     obvious falsehood -- that for the most part she did not remember anything
12     about anything. Although she responded, "yes" when asked if defendant
     threatened her, she responded, "I don't remember" when asked about what
13     he said.

14  At footnote five the state court added:

15         Even the prosecutor acknowledged in closing argument that
     Domondon's trial testimony was not truthful.  In denying the motion for
16     new trial, the court acknowledged Domondon's failure of recollection was
     "obviously feigned."  The prosecutor and court attributed Domondon's lies
17     to fear of defendant.

18  The state court continued:

19         Sheriff's Detective Will Bayles testified that in his first interview
     with Domondon on the day of the killing (September 14, 2001), she did
20     not mention defendant, but in later interviews she told him the following:
     On September 13, 2001, she came home from work around 11:00 p.m.,
21     and defendant was there. When she awoke at 11:00 the next morning,
     defendant was there. Defendant asked her where Shelmire was. Defendant
22     said something to the effect that Shelmire must have been caught running.
     Domondon got the impression that defendant was saying Shelmire got
23     caught running while participating in a robbery. Defendant said he got wet
     running through a creek and Shelmire should have turned right but turned
24     left (or vice versa) and did not make it back to the area that he should
     have. Domondon later told defendant she had talked to the police, and he
25     told her he was angry at her for being a "snitch." About a week after the
     killing, defendant put his hands on her and said, "Your boyfriend is
26     washed [sic]. You might as well just forget about him. They are never

4

going to catch me. Your boyfriend is going to go down for this."
Defendant said, "I already got it all planned out. I have a doctor's note
September 11th. I hurt my ankle. I was in bed this whole time. This is the
first time that I have been out of bed." Defendant said if the police asked
him how he knew Domondon, he planned to say he was trying to have sex
with her and did not know Shelmire. Domondon was scared. Defendant
asked her why she was shaking. She did not answer. He folded his hands,
told her to look him in the eyes, and said, "I feel like killing the
motherfucker." She asked why. He said, "because people don't know how
to keep their mouths shut. . . . I'm leaving. I think I have scared you
enough." Defendant also told her he got rid of the gun.

The prosecution introduced evidence that, within an hour of
Aguiar's struggle with the intruder, deputy sheriff Mark Smalley collected
a scraping from underneath Aguiar's right index fingernail, after swabbing
Aguiar's finger with sterile water. Aguiar had not washed his hands and
was covered in Roberts's blood from having administered CPR.

The prosecution's DNA expert, criminalist Jeffrey Herbert, testified
DNA is found in bodily fluids containing cellular material, e.g., sweat,
saliva, semen, and white (but not red) blood cells. Although Herbert
worked for many years at the crime lab in other capacities, his DNA
training began in 2000 and lasted almost a year. He passed a competency
test in 2001 (two years before his testimony in this case). At the time of
trial, he had performed over 80 DNA analyses and qualified as an expert
witness in about 10 DNA cases.

Herbert concluded defendant was a potential source of DNA found
in the scraping from Aguiar's fingernail. Herbert came to this conclusion
by looking at the scraping's profile, subtracting Aguiar's profile, and
developing a profile from what was left. He compared that profile with
reference profiles he had for the murder victim (Roberts), defendant, and
co-defendants Shelmire and Jones. The profiles from Roberts and Aguiar
share some alleles, but Herbert eliminated Roberts because "there are too
many types present that are not from him." Herbert eliminated everyone
except defendant. All of the markers present in the reference sample were
also present in the fingernail scraping, indicating defendant was a potential
source of the DNA in the scraping. If another profile was present in the
mixture, it would be harder to interpret, but Herbert could still include
defendant as a "potential source."

Using a computer program to determine statistical probabilities,
Herbert concluded the odds of somebody else having that profile would be
one in 190 billion unrelated persons in the African-American population,
one in 720 billion of the Caucasian population, and one in 240 billion
Hispanic people. There are six and a half billion people on the planet.
People related by blood would be more likely to have similar profiles, so
the statistical probabilities would be "a lot lower," but it is "very unlikely"
that even a close relative like a brother would have an identical profile,
unless it was a twin brother.

On cross-examination of Herbert, the defense elicited that it is very
easy to contaminate a DNA sample. Herbert also said he would be
concerned about Roberts's profile showing up if Roberts's blood was on
Aguiar. It would be more difficult to interpret a mixture of three persons.
However, the possibility of contamination or presence of Roberts's blood

5

would not change Herbert's conclusion that defendant is included as a potential source of the DNA.

Herbert acknowledged he had no way of knowing when DNA was deposited.

The defense case, as expressed in the appellate brief, was that defendant had no eye injury, wore dreadlocks rather than the braids described by Aguiar, and was not identified by Aguiar as the assailant. Additionally, Kim Domondon never mentioned defendant in her initial interview with the detectives.

The prosecutor's theory, as presented to the jury, was that Aguiar was simply mistaken and had put his finger up the assailant's nose rather than the eye.

On August 18, 2003, the jury returned a verdict finding defendant guilty of first degree murder (§ 187) and finding true the allegations that the murder occurred during a burglary (§ 190.2, subd. (a)(17)) and that defendant was a principal and one or more principals were armed with a firearm (§ 12022, subd. (a)(1)).

On October 22, 2003, the court appointed John Cotter to represent defendant on a motion for new trial. The defense filed a motion for new trial on the grounds of ineffective assistance of counsel, insufficiency of the evidence, and prosecutorial misconduct.

A hearing was held on the motion for new trial between March and July 2004, with witness testimony including the following:

Dr. Harry Khasigian, after examining defendant in court and reviewing his medical records, said defendant has a history of dislocation of the left patella (the knee slips out of place) with associated osteoarthritis, instability and loose body in the left knee. He might be able to scale a five-foot-high fence but would probably dislocate his knee as he tried to twist or rotate over the fence. The doctor could not say it was impossible for defendant to run or jump fences, but it was very unlikely.

Defendant's trial counsel, Julian Macias, testified he knew defendant had a knee condition, which put into question whether he could run and jump fences, [and] which put into question whether he was one of the three men seen running from the scene of the crime.  Macias thought the knee issue was a "red herring" detrimental to the defense and could not be proved without defendant testifying, and other witnesses would testify defendant had no problem walking (including a jail inmate who . . . saw defendant kicking Karate-style at the wall in his cell). Macias said the defense in this case was the absence of an eye injury, and defendant agreed with him the knee issue should not be raised.

DNA defense counsel Lisa Franco testified defense trial counsel Macias was ill-prepared.  She smelled alcohol on his breath during a recess in jury selection, but she did not know if he was impaired. Although Franco was critical of Macias's handling of the case, she could not identify anything that was not done that should have been done.  She merely indicated she would have liked to explore the idea that if defendant were the intruder, his DNA should have been found in the apartment, not merely under Aguiar's fingernail. Franco acknowledged the defense had its own DNA expert review the evidence, but Franco did not need to call her as a witness because, as Franco said, "I was able to get what I needed from the prosecution lab witnesses." Franco said the defense expert did not say the

1  lab results were wrong, but there were issues about interpretation.

2          Defendant's original attorney, Judith Odbert, testified to her work-up of the case until she turned it over to Macias. During her testimony, the prosecutor stipulated, as already found by the court, that the prosecution

3  did not contest defendant's position that he had no eye injury.  Odbert did not notice any nose injury on defendant.

4          Defendant testified at the hearing on his motion for new trial, that Odbert spent a lot of time with him, but Macias spent very little time with

5  him, only about three-and-a-half hours total. Defendant testified he had difficulty walking. He wanted Macias to introduce into evidence his

6  medical records and photographs of his swollen knee taken two days before the crime by one Theresa Massengill (unclear if related to Tina) for

7  purposes of Social Security Disability. Defendant said Macias said the evidence was unnecessary because the prosecution had not proved his

8  guilt.  Macias also failed to get other witnesses requested by defendant concerning, e.g., his knee, his absence of facial injury, and the ease with

9  which hair is pulled out when worn in dreadlocks, as defendant wore his hair, raising the question why defendant's hair was not found at the scene

10  of the struggle. Defendant said Macias smelled of alcohol and at times seemed impaired.

11          The trial court denied the motion for new trial. As to ineffective assistance of counsel, the court said Macias's performance was deficient in

12  various respects, e.g., failure to present evidence of the knee handicap, but prejudice had not been shown. The court said the defense, in order to

13  obtain a new trial, had to discredit the DNA evidence, but had failed to do so.  The defense's arguments about the DNA evidence failed to explain

14  how the allegations of potential contamination or corruption could have resulted in defendant's biological tissue being found underneath Aguiar's

15  fingernail. The court disregarded the assertion that Macias smelled of alcohol during jury selection, because Macias did not appear to be

16  impaired.  The court concluded that, even assuming Macias's performance was deficient, there was no prejudice warranting a new trial.

17

18  **B.**    **Procedural History**

19          Petitioner was convicted of first degree murder on August 18, 2003.  The jury

20  found true that petitioner was a principal in the crime, that one or more principals were armed,

21  and that the crime occurred during the commission of a burglary.  Petitioner was sentenced to life

22  in prison without the possibility of parole.  Petitioner filed a timely direct appeal.  While his

23  direct appeal was pending, petitioner filed a petition for a writ of habeas corpus in the

24  Sacramento County Superior Court, which was denied on October 29, 2004, for lack of

25  jurisdiction given the pendency of petitioner's direct appeal.  The California Court Appeal

26  affirmed petitioner's conviction and sentence on direct appeal in an unpublished opinion issued

on April 6, 2006.  That opinion was modified on May 4, 2006, with no change in judgment.  The California Supreme Court denied direct review without comment or citation on June 21, 2006.  Petitioner did not file any further state habeas actions.

Respondents argue that some of the claims raised in the instant federal petition are not exhausted but, without waiving the exhaustion defense, that the claims should nonetheless be denied on the merits.

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

///

///

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

Under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law.  In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards.  A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply.  See Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

10

1

## III.  DISCUSSION

2      Petitioner raises the following claims:  (1) ineffective assistance of trial counsel

3  Macias; (2) ineffective assistance of DNA counsel Franco; (3) ineffective assistance of appellate

4  counsel; (4) insufficient evidence; and (5) prosecutorial misconduct.  Respondents argue that

5  petitioner is not entitled to relief on the merits of his first claim.  As to the remaining claims,

6  respondents argue that petitioner failed to exhaust the stated claims for relief and, in any event,

7  petitioner is not entitled to relief on the merits.  Petitioner has filed a motion for a stay and

8  abeyance order to allow him to return to state court to exhaust unexhausted claims.

9      **A.      Ineffective Assistance of Counsel Claims (Ground One, Three, and Four)**

10      The Sixth Amendment guarantees the effective assistance of counsel.  The United

11  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

12  Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

13  all the circumstances, counsel's performance fell below an objective standard of reasonableness.

14  See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

15  have been the result of reasonable professional judgment.  See id. at 690.  The federal court must

16  then determine whether, in light of all the circumstances, the identified acts or omissions were

17  outside the wide range of professional competent assistance.  See id.  In making this

18  determination, however, there is a strong presumption "that counsel's conduct was within the

19  wide range of reasonable assistance, and that he exercised acceptable professional judgment in all

20  significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

21  Strickland, 466 U.S. at 689).

22      Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

23  at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

24  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

25  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

26  see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

### 1.   Trial Counsel Macias (Ground One)

In Ground One, petitioner claims that trial counsel Macias was ineffective for the following reasons:

    a.   Counsel failed to investigate and introduce evidence concerning petitioner's knee problem;

    b.   Counsel "let the cat . . . out of the bag" by referring to the jailhouse informant during opening statements; and

    c.   Counsel did not adequately follow up on the torn real estate ad with the handwritten notations.

Regarding the real estate ad, the state court determined that counsel was not deficient:

> Defendant complains Macias did not follow-up on handwriting analysis of the gate code on the real estate ad.  Macias testified at the hearing on the new trial motion that he was aware there was an outstanding request for a handwriting analysis, but he believed the handwriting was "probably" defendant's, and defendant ultimately admitted it was his handwriting.

This court agrees.  Given defendant's ultimate admission that the handwriting on the ad was his, trial counsel acted reasonably in not pursuing the matter further.

As to petitioner's other arguments in support of his claim of ineffective assistance of trial counsel, the state court presumed deficient performance but found no prejudice.  The state court held:

> We assume for purposes of this appeal that Macias's performance was deficient with respect to (1) failure to introduce evidence of defendant's knee condition, (2) absence of a face injury, (3) the victim's

suspicion of neighbor Lamont, and (4) Macias's mention of the jail informant who supposedly said defendant confessed but who was not called as a witness.[2]

The question is whether these deficiencies prejudiced defendant. We shall conclude they did not.

Defendant argues the trial court applied the wrong test, because the court said counsel's performance did not so undermine "the proper functioning of the adversarial process such that the trial cannot be relied upon as having produced a just result." Defendant says this quote comes from a passage in Strickland v. Washington, supra, 466 U.S. 668, explaining the principle underlying the recognition that the constitutional right to counsel means "effective assistance" of counsel. Defendant asserts that the proper test, as stated in Strickland, supra, is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (citations omitted). Defendant fails to show the trial court got it wrong, and on independent review we would reach the same conclusion as the trial court.

Defendant submits that, had the jury heard from the medical expert about his knee and the probabilities of his ability to run and jump fences, and from witnesses about the absence of any injury to his face (including his nose) and about other people having connections to Roberts's apartment and knowledge of his marijuana enterprise, then it is reasonably probable the jury would have questioned the conclusion of prosecution DNA expert Herbert, based on his "unscientific assumptions," that defendant was included in the DNA found under Aguiar's fingernail. We disagree.

Defendant fails to meet his burden to show that, absent counsel's deficiencies, it is reasonably probable the verdict would have been more favorable to defendant. The medical evidence would not show it was impossible for defendant to jump fences, but only that it would be difficult for him to do so. People who knew defendant were unaware of any knee handicap. The jury did hear some evidence that defendant had no nose injury. That a neighbor of Roberts may have known of the marijuana and cash does not demonstrate prejudice. There was ample other evidence of defendant's guilt, such as the DNA evidence, the incriminating statements defendant made to Kim Domondon, and the real estate ad with the gate code written on it (which retains its probative value despite defendant's contentions that his attorney should have done more to refute it).

As to the jailhouse informant, the state court added:

> . . . The trial court found Macias made a mistake [in mentioning the informant during opening statements], but it was not prejudicial, because there was no further mention of the matter by anyone, and the jury was instructed to base its decision only on the evidence.

---

[2]     Petitioner does not argue ineffectiveness concerning absence of face injury or suspicion of Lamont in the instant petition.

1   The state court concluded:

2           We conclude that, absent counsel's errors, it is not reasonably
        probable that the verdict would have been more favorable to defendant.
3       Accordingly, his claim of ineffective assistance of counsel fails.

4           Regarding the knee injury, the court agrees with the state court that petitioner has

5   not established prejudice.  As the state court observed, the evidence petitioner would have had

6   trial counsel introduce would not have shown that it was impossible for him to jump the fence.

7   Rather, it would only have demonstrated that petitioner would have had difficulty jumping the

8   fence.  Further, the jury heard testimony from people who knew petitioner that they were

9   unaware of any knee problems.  Thus, even if trial counsel had introduced medical evidence of a

10  knee problem, the jury could have still concluded petitioner was the assailant.  In other words,

11  petitioner has not demonstrated that, but for counsel's failure to introduce such evidence, the

12  result of the trial would have likely been different.  Moreover, petitioner agreed with trial counsel

13  that the knee issue should not be raised.

14          Finally, as to the jailhouse informant, the record demonstrates the only mention of

15  the informant was during trial counsel's opening statement.  The court agrees with the state

16  court's conclusion that any error was cured by the trial court's instruction that the jury should

17  only consider evidence presented at trial.  There is no indication that mention of the jailhouse

18  informant was made during the presentation of evidence.

19          For the foregoing reasons, the court concludes that the state court's determination

20  of petitioner's ineffective assistance of trial counsel claims was neither contrary to nor an

21  unreasonable application of the law.

22          2.      DNA Counsel Franco and Appellate Counsel (Grounds Three and Four)

23          Petitioner claims in Ground Three that DNA counsel Franco was ineffective

24  because she did not call a defense expert witness to rebut the testimony of the prosecution DNA

25  expert.  He also claims in Ground Four that appellate counsel was ineffective for failing to argue

26  on appeal the ineffectiveness of DNA counsel Franco.  Respondents argue this court cannot grant

1    relief on these claims because they are unexhausted.

2           Under 28 U.S.C. § 2254(b), the exhaustion of available state remedies is required

3    before the federal court can grant a claim presented in a habeas corpus case.  See Rose v. Lundy,

4    455 U.S. 509 (1982); see also Kelly v. Small, 315 F.3d 1063, 1066 (9th Cir. 2003); Hunt v.

5    Pliler, 336 F.3d 839 (9th Cir. 2003).   "A petitioner may satisfy the exhaustion requirement in

6    two ways:  (1) by providing the highest state court with an opportunity to rule on the merits of the

7    claim . . .; or (2) by showing that at the time the petitioner filed the habeas petition in federal

8    court no state remedies are available to the petitioner and the petitioner has not deliberately

9    by-passed the state remedies."  Batchelor v. Cupp , 693 F.2d 859, 862 (9th Cir. 1982) (citations

10   omitted).  The exhaustion doctrine is based on a policy of federal and state comity, designed to

11   give state courts the initial opportunity to correct alleged constitutional deprivations.  See Picard

12   v. Connor, 404 U.S. 270, 275 (1971); see also Rose, 455 U.S. at 518.

13          Regardless of whether the claim was raised on direct appeal or in a post-

14   conviction proceedings, the exhaustion doctrine requires that each claim be fairly presented to the

15   state's highest court.  See Castille v. Peoples, 489 U.S. 346 (1989).  Although the exhaustion

16   doctrine requires only the presentation of each federal claim to the highest state court, the claims

17   must be presented in a posture that is acceptable under state procedural rules.  See Sweet v.

18   Cupp, 640 F.2d 233 (9th Cir. 1981).  Thus, an appeal or petition for post-conviction relief that is

19   denied by the state courts on procedural grounds, where other state remedies are still available,

20   does not exhaust the petitioner's state remedies.  See Pitchess v. Davis, 421 U.S. 482, 488

21   (1979); Sweet, 640 F.2d at 237-89.  An exception to this rule exists if the federal court finds that

22   the facts have been pled before the highest state court with as much particularity as is practicable.

23   See Kim v. Villalobos, 799 F.2d 1317, 1320 (9th Cir. 1986).

24   / / /

25   / / /

26   / / /

1    In addition to presenting the claim to the state court in a procedurally acceptable

2 manner, exhaustion requires that the petitioner make the federal basis of the claim explicit to the

3 state court by including reference to a specific federal constitutional guarantee. See Gray v.

4 Netherland, 518 U.S. 152, 162-63 (1996); see also Shumway v. Payne, 223 F.3d 982, 998 (9th

5 Cir. 2000).  It is not sufficient for the petitioner to argue that the federal nature of the claim is

6 self-evident.  See Lyons v. Crawford, 232 F.3d 666, 668 (9th Cir. 2000), amended by 247 F.3d

7 904 (9th Cir. 2001).

8    A review of the California Court of Appeal's opinion on direct review reflects that

9 the court never addressed any arguments regarding DNA counsel Franco.  This is entirely

10 understandable given that petitioner's brief to the Court of Appeal only argued ineffective

11 assistance by trial counsel Macias.  As to ineffective assistance of appellate counsel – which

12 obviously would not have been raised on direct appeal – petitioner did not raise any arguments

13 regarding appellate counsel in his petition for review to the California Supreme Court or his

14 premature state habeas petition.  The claims raised in Grounds Three and Four are, therefore,

15 unexhausted because petitioner failed to present them at all to the state courts.

16   **B.**    **Sufficiency of the Evidence (Ground Two)**

17    Petitioner argues the evidence was insufficient to sustain his conviction.  In

18 particular, he claims the evidence failed to meet the standard set forth in Jackson v. Virginia, 443

19 U.S. 307, 319 (1979), which tests whether rational jurors could reach the conclusion that the

20 jurors in this case reached based on the evidence presented.  Petitioner asserts that evidence

21 adduced at trial regarding the real estate ad, statements made by Domondon, and the DNA

22 evidence cannot support his conviction.

23    Respondents argue this claim is not exhausted because petitioner did not raise the

24 federal dimension of his claim in the state courts.  Rather, according to respondents, petitioner's

25 state court arguments were premised on the notion that the trial court erred in denying his motion

26 for a new trial because the evidence was not sufficient.  Respondents conclude that, because

1  petitioner only presented his sufficiency of the evidence claim in the context of the trial court's

2  ruling on a motion for a new trial under state law, he failed to fairly present the federal

3  constitutional aspect of the claim.  A review of the record, however, belies this contention.  First,

4  petitioner's appellate counsel argued, at page 79 of petitioner's opening brief to the Court of

5  Appeal, that his sufficiency of the evidence claim should be considered under Jackson.  Further,

6  counsel consistently argued the Jackson rational jury standard on direct appeal.  Finally, the state

7  court itself recognized that petitioner argued the federal constitutional test should apply:

8           Defendant asks us to apply the standard for a direct appellate
        challenge to the sufficiency of the trial evidence, i.e., whether, after
9       viewing the evidence in the light most favorable to the prosecution, any
        rational trier of fact could have found the essential elements of the crime
10      beyond a reasonable doubt.  (Jackson v. Virginia (1979) 443 U.S. 307,
        318-319 . . . ).

11

12  Additionally, the state court concluded that, even under the Jackson standard, petitioner would

13  not be entitled to relief.  For these reasons, the court rejects respondents' argument that petitioner

14  failed to present the constitutional aspect of this claim to the state court.

15          As to the merits of petitioner's claim, the state court initially noted that, by

16  arguing that the sufficiency of the evidence must be considered in light of omissions of his trial

17  attorneys –  Macias and Franco – petitioner was ". . . mixing two concepts – sufficiency of the

18  evidence presented at trial, and a prejudice analysis for ineffective assistance of counsel."  As to

19  the sufficiency of the evidence aspect of the argument, the state court then held:

20           As to the claim of insufficiency of the evidence, we believe the
        appropriate standard is the one urged by the People for sufficiency of the
21      evidence but, under either standard, defendant fails to show grounds for
        reversal.  . . . [¶] Clearly, there was sufficient evidence supporting the trial
22      court's decision to deny the motion for a new trial, including . . . the
        incriminating statements defendant made to Kim Domondon, the real
23      estate ad with notation of the gate code found in defendant's room, and the
        DNA evidence.
24           Under the heading of sufficiency of the evidence, defendants says
        Kim Domondon's motive to shift the blame from her boyfriend to
25      defendant impeaches her statements.  However, Domondon's statements
        did not exculpate her boyfriend but incriminated both him and defendant.

26

1          As to the real estate ad, defendant merely asserts other people had
access to his room and the ad bore a handwritten notation of March 11,
2  whereas the crime occurred in September (points that defendant faults his
attorney for failing to emphasize).  These points do not detract from the
3  ad's probative value.  Defendant's position is not helped by his argument
that the jury relied on the real estate ad because they asked to see it during
4  deliberations.

5  The state court offered the following analysis as to Domondon:

6          Defendant argues Kim Domondon's report to the detective,
attributing incriminating statements to defendant, was suspect because she
7  was Shelmire's girlfriend and may have been told what to say by Shelmire,
who had a motive to make trouble for defendant, because Shelmire was
8  unhappy with defendant for flirting with Kim.  However, the statements
Domondon attributed to defendant implicated her boyfriend as well as
9  defendant.  The motive of retaliation for flirting is speculation based on a
detective's testimony during the preliminary hearing who said he (1)
10  believed Shelmire said something about defendant "trying to hit on" Kim,
and (2) did not recall Shelmire liking that fact.  This matter was not
11  presented at trial.  Defendant on appeal raises this issue in his discussion
of prejudice, not in his discussion of his attorney's deficiencies, and he has
12  therefore forfeited any contention that counsel was deficient in omitting
this point at trial.  Additionally, we note the trial court in ruling on the new
13  trial motion stated its observation that Kim Domondon clearly exhibited
fear of defendant during her trial testimony.

14

15          The state court then engaged in a lengthy discussion of petitioner's main

16  argument, both on direct appeal and in this case – that the DNA evidence provided the sole

17  evidence of guilt but was not sufficient to do so.  As the state court noted, petitioner relies on the

18  trial court's comments in denying the motion for a new trial in support of his contention the

19  DNA evidence was the sole evidence of guilt:

20          . . . Defendant quotes the trial court's comments in denying the
motion for new trial:  "The trial evidence, specifically DNA evidence,
21  established conclusively in my mind that [defendant] is the person who
grappled with [Aguiar].  [¶] I'm satisfied that the collection and analysis of
22  the fingernail scrapings from [Aguiar] and samples from the defendant
were performed in an appropriate manner."

23

24  The state then added at footnote ten:

25          As defendant notes, the trial court continued:  "Together with the
other evidence, it [the DNA evidence] reliably established that [defendant]
26  is, in fact, the person who shot and killed Justin Roberts."

1  The state court continued:

2      . . . Defendant also cites the court's comment, in rejecting the claim of
       ineffective assistance of counsel, that :[t]he DNA evidence is
3      overwhelmingly persuasive.  In combination with the other evidence that I
       described in ruling on the insufficiency of the evidence argument at our
4      last court proceeding, in my opinion the trial produced a just result."

5  The state court concluded by observing that, contrary to petitioner's argument that the DNA

6  evidence was the only evidence of guilt, the DNA evidence was used in combination with other

7  evidence to determine guilt.

8          Petitioner argues that evidence regarding the real estate ad, statements made by

9  Domondon, and the DNA evidence cannot support his conviction.  The court does not agree.  As

10 the state court determined, petitioner's arguments go to the weight the jury should have given the

11 ad, not its probative value.  It was exclusively the province of the jury to determine the weight of

12 the evidence.  In other words, while the ad may not have been the strongest evidence of guilt, it

13 was nonetheless some evidence the jury could consider and was not insufficient to establish guilt.

14         Turning to Domondon, petitioner argues that her statements were "suspect"

15 because she was Shelmire's girlfriend and Shelmire had a motive to lie and to tell Domondon to

16 lie.  As with the real estate ad, while Domondon's statements may indeed have been entitled to

17 little weight given her relationship with Shelmire, the weight to be given her statements was a

18 question solely for the jury.  Under Jackson, the court concludes that the jury could have reached

19 a determination of guilt based on Domondon's statements.  The testimony was, therefore, not

20 insufficient.

21         Finally, petitioner contends the DNA evidence was insufficient to support his

22 conviction.  The DNA evidence, along with all the other evidence, certainly supports the jury's

23 conclusion that petitioner was the assailant.  The prosecution's DNA expert testified that

24 defendant was a potential source of DNA found in the scraping from Aguiar's fingernail because

25 the odds of somebody else having the particular DNA profile he observed would be one in 190

26 billion unrelated persons in the African-American population, one in 720 billion of the Caucasian

1  population, and one in 240 billion Hispanic people.  This was evidence upon which a rational

2  jury could have based a finding of guilt.

3          Based on the foregoing, the court concludes that the state court's determination of

4  petitioner's sufficiency of the evidence claim was neither contrary to nor an unreasonable

5  application of the law.

6      **C.    Prosecutorial Misconduct (Ground Five)**

7          Success on a claim of prosecutorial misconduct requires a showing that the

8  conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

9  process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to

10  determine "whether, considered in the context of the entire trial, that conduct appears likely to

11  have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

12  Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of constitutional magnitude is

13  determined, such error is considered harmless if the court, after reviewing the entire trial record,

14  concludes that the alleged error did not have a "substantial and injurious effect or influence in

15  determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Error is

16  deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's

17  substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).  Depending on

18  the case, a prompt and effective admonishment of counsel or curative instruction from the trial

19  judge may effectively "neutralize the damage" from the prosecutor's error.  United States v.

20  Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at  806).

21          Petitioner argues:

22      As to the claim of prosecutorial misconduct, petitioner adopts the
       argument that was raised in the P.C. § 1181 motion and . . . direct appeal
23      briefs.  Petitioner would add the following for this court's review.  Exhibit
       "F" to this petition are two law enforcement interviews of Kim
24      Domondon.  These interviews are the contradictory impeachment
       statements Domondon gave.  The prosecution had these pieces of
25      discovery in its possession but yet chose to develop perjured testimony to

26  ///

1   secure a conviction.[3]

2   As to the portions of this claim raised in petitioner's § 1181 motion for a new trial and on direct

3   appeal, the state court identified the following alleged incidents of misconduct:

4       1.    The prosecutor referenced matters outside the record;

5       2.    The prosecutor engaged in name-calling;

6       3.    The prosecutor improperly shifted the burden of proof.

7   With respect to the prosecutor's alleged reference to matters outside the record,

8   the state court described the prosecutor's challenged statements as follows:

9   > The prosecutor during closing argument argued to the jury that
10  > defendant needed money for rent, he told his landlady he was "working on
>    it," but "[t]here has been no evidence in this trial that the defendant had a
>    job so what was he working on?  Well, you know what he was working
11  > on."  [¶] Defense counsel objected this was improper argument about not
>    having a job.  The trial court overruled the objection, stating it was a fair
12  > comment on the evidence.  [¶] The prosecutor continued:  "What was he
>    working on?  He knew exactly what he was working on . . . robbing Justin
13  > Roberts' apartment."
>    Defendant asserts the prosecutor knew from the preliminary
14  > hearing that defendant was a rap artist pursuing a career in music. . . .
>    There is a reference [in the preliminary hearing] to selling some items for a
15  > profit, but it is not clear what or when.  Moreover, defendant fails to show
>    any of this evidence was presented to the jury, hence he fails to show the
16  > prosecutor's remark was wrong in light of evidence adduced at trial.

17  The state court concluded:

18  > Defendant cites authority that it is misconduct to invite the jury to
>    speculate or consider facts outside the record.  However, he fails to show
19  > the prosecutor did so.  The prosecutor merely engaged in his "wide-
>    ranging right" to discuss the case and his views as to what the evidence
20  > showed and to urge conclusions he deemed proper.  (citation to state law
>    omitted).

21

22  ///

23  ///

24  ///

25  _____

26      [3]    Petitioner does not assert any <u>Brady</u> violation based on failure to turn over
exculpatory evidence.

1    The gravamen of petitioner's argument concerning matters outside the record is

2    there was no evidence presented that he <u>did not</u> have a job, as the prosecutor suggested, and that

3    he in fact was pursuing a career in rap music.  The court agrees with the state court that the

4    prosecutor did not refer to any facts which were not adduced at trial.  Rather, the comments

5    reflected the prosecutor's arguments about the lack of evidence that petitioner <u>did</u> have a job, and

6    the conclusions that could be drawn from the trial evidence as a whole.  There is a difference

7    between comments about evidence the petitioner was unemployed – which would have been

8    outside the record – and comments on the absence of evidence petitioner was employed – which

9    was a fair reading of the record.

10    As to name-calling, the state court described the following alleged misconduct:

11           In closing argument, in talking about the real estate ad with the
       security code being found in a trash bag in defendant's room, the
12       prosecutor said, "Like any typical criminal, he [defendant] got sloppy and
       got caught."  Defendant complains of this "name calling."
13

14    The state court held:

15           . . . [E]ven assuming for the sake of argument that there is no
       forfeiture [of this claim for failure to object at the time of trial], we see no
16       basis for reversal.  A prosecutor is allowed to use appropriate epithets
       warranted by the evidence.  (citations to state law omitted).
17

18    This court agrees that there was no improper name-calling.  Specifically, the prosecutor did not

19    even call petitioner a name (by calling petitioner a criminal).  Rather, by using the words "like"

20    and "typical," the prosecutor merely suggested an analogy, which was a fair comment on the

21    evidence.

22    Next, turning to the prosecutor's alleged burden shifting, the state court identified

23    the following allegedly improper comments:

24           "DNA, his DNA found underneath Eric Aguiar's fingernails, his
       DNA, not Defendant Shelmire's, not Defendant Jones'.  Craver's . . .
25       DNA, one out of 190 billion.  [¶] They are going to get up there and talk.
       Miss Franco will come up here and trash Mr. Herbert [the prosecution's
26       DNA expert].  That's coming.  That's coming, but let me ask you this:  If

22

1
2

> Mr. Herbert was so wrong, his calculations are off, he didn't know what he was talking about, why didn't nobody [sic] come to court to contradict anything he said? . . ."

3   The court agrees with the state court, which concluded these comments did not amount to an

4   improper burden shifting.  Specifically, the prosecutor never suggested that it was defendant's

5   burden to establish innocence via DNA evidence.  Rather, the prosecutor merely commented on

6   the defense's lack of evidence to rebut Herbert's DNA testimony.  Moreover, the prosecutor

7   specifically stated later in his argument:  "The People do have the burden of proof."

8         In sum, none of the alleged instances of prosecutorial misconduct addressed by

9   the state court could reasonably have had a substantial and injurious effect on the outcome of the

10   trial.  The court, therefore, concludes that the state court's adjudication was neither contrary to

11   nor an unreasonable application of the law.

12         Finally, as to petitioner's claim the prosecutor engaged in misconduct by offering

13   perjured testimony, that claim was never raised in the state courts.  It is, therefore, unexhausted.

14   **D.     Stay and Abeyance Motion**

15         Petitioner has requested a stay and abeyance order to allow him to return to state

16   court to exhaust unexhausted claims.  There are two approaches for analyzing a stay-and-

17   abeyance motion, depending on whether the petition is mixed or fully exhausted.  See Jackson v.

18   Roe, 425 F.3d 654, 661 (9th Cir. 2005).  If the petitioner seeks a stay-and-abeyance order as to a

19   mixed petition containing both exhausted and unexhausted claims, the request is analyzed under

20   the standard announced by the Supreme Court in Rhines v. Weber, 544 U.S. 269 (2005).  See

21   Jackson, 425 F.3d at 661.  If, however, the petition currently on file is fully exhausted, and what

22   petitioner seeks is a stay-and-abeyance order to exhaust claims not raised in the current federal

23   petition, the approach set out in Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003), overruled on

24   other grounds by Robbins v. Carey, 481 F.3d 1143 (9th Cir. 2007), applies.  See Jackson, 425

25   F.3d at 661.

26   / / /

1       Here, it is unclear which standard applies.  On the one hand, the petition on file is

2  mixed in that it contains both exhausted and unexhausted claims.  On the other hand, petitioner

3  seeks by way of his stay and abeyance motion to return to state court to exhaust new claims not

4  raised in the current petition.  Petitioner does not seek to exhaust unexhausted claims currently

5  before the court.  The court will, therefore, consider petitioner's motion under both <u>Rhines</u> and

6  <u>Kelly</u>.

7       Under <u>Rhines</u>, as a threshold condition for this court to exercise its discretion to

8  issue a stay-and-abeyance order, the court must determine that there was good cause for failing to

9  exhaust his claims before raising them in this case.  <u>See Rhines v. Weber</u>, 544 U.S. at 277.  If

10  there is good cause for petitioner's failure to exhaust, it may be an abuse of discretion to deny

11  stay and abeyance where there is no indication of intentional dilatory litigation tactics.  <u>See id.</u> at

12  278.  Stay and abeyance is not appropriate where the unexhausted claim is plainly meritless.  <u>See</u>

13  <u>id.</u> at 277.

14       In his stay and abeyance motion, petitioner states:

15       . . . In September 2006 petitioner received evidence in the mail of obvious
Constitutional violations pertenent [sic] to the current § 2254 petition.

16       Petitioner researched the applicable laws governing this newly discovered
evidence and thus has filed a Habeas Corpus Petition in the trial court as

17       well as the state court of appeal for the Third Appellate district in
Sacramento.  Both courts denied the petition, and the petition has been

18       mailed to the California Supreme Court for review, and exhaustion of state
court remedies.  The factual basis of the claims are tantamount towards

19       this current Habeas Petition, and deal with issues of CONFLICT OF
INTEREST BY TRIAL COUNCEL [sic] LISA FRANCO I.A.C. 6th and

20       14th AMENDMENT VIOLATIONS, AND BIAS BY THE TRIAL
JUDGE JUDICIAL MISCONDUCT RESULTING IN PLAIN ERROR.

21

22  Petitioner cites <u>Rhines</u> in support of his request for a stay and abeyance order.  Petitioner attaches

23  to his motion the following documents:

24       1.    Petition for writ of habeas corpus to the California Supreme Court, dated
August 14, 2007;

25

26       2.    Sacramento County Superior Court order denying habeas petition, issued
July 17, 2007; and

3.      California Court of Appeal order denying habeas petition, issued August 9, 2007.

A search of the Sacramento County Superior Court's public information archive reveals that the habeas petition was filed in that court on April 30, 2007.

Assuming that petitioner's claims could not have been raised earlier than September 2006 – when he says he discovered new evidence supporting the claims – petitioner has not demonstrated good cause for the delay until April 2007, which is when he first presented the new claims to the state courts.  Moreover, petitioner has made no showing at all regarding the unexhausted claims raised in the instant federal petition.  Therefore, under <u>Rhines</u>, petitioner is not entitled to a stay and abeyance order.

Under <u>Kelly</u>, the district court is required to ". . . consider the option of holding the exhausted petition in abeyance so that the petitioner would be able to exhaust his claims in state court before attempting to amend his federal petition to include the newly exhausted claims."  <u>Jackson</u>, 425 F.3d at 661 (citing <u>Kelly</u>, 315 F.3d at 1070).  Whether to exercise this option is within the discretion of the district court.  <u>See Kelly</u>, 315 F.3d at 1070.  However, the Ninth Circuit has recognized the ". . . clear appropriateness of a stay when valid claims would otherwise be forfeited."  <u>Id.</u>  Moreover, a stay under such circumstances promotes comity by deferring the exercise of federal jurisdiction until after the state court has ruled.  <u>See id.</u>

The court concludes that a stay and abeyance order is not warranted under the discretion vested by <u>Kelly</u>.  Petitioner's new ineffective assistance of counsel claim is not valid because, as revealed by the Sacramento County Superior Court's decision, it was procedurally defaulted.  As to judicial misconduct, that new claim is premised on petitioner's assertion that the trial judge should have dismissed Franco due to a conflict of interest.  According to petitioner's exhibits, counsel for co-defendant Shelmire informed the trial judge that petitioner had made death threats against Shelmire.  This claim was not addressed by the Sacramento County Superior Court in its July 17, 2007, decision and apparently was raised for the first time in

petitioner's August 14, 2007, filing in the California Supreme Court.  In any event, it would also be defaulted because, if petitioner himself made the threats, he should have known about the alleged conflict at the time he filed his direct appeal.  Moreover, petitioner's death threat to Shelmire does not suggest a conflict with Franco.[4]

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.      Petitioner's motion for a stay and abeyance order (Doc. 28) be denied;

2.      Petitioner's petition for a writ of habeas corpus (Doc. 1) be denied; and

3.      The Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  December 21, 2007

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

---

[4]      Petitioner's argument is based on the erroneous assertion that the threats were "made by petitioner to Franco."